GRUENDER, Circuit Judge,
dissenting.
I would hold that the provisions of § 7 of the Act fall within the bounds of constitutionality, as defined by Casey, for informed consent provisions in the abortion context. Accordingly, I would hold that Planned Parenthood’s challenge to the Act cannot succeed on the merits and that the preliminary injunction should be vacated in its entirety. In any event, I would hold that only the unconstitutional provisions of the Act, if any, should be enjoined. Therefore, I respectfully dissent.
In my view, the proper approach to this issue requires a provision-by-provision analysis of each disclosure provision of § 7 of the Act. Under such an approach, most of the Act easily passes constitutional muster under established precedent. The only provision that the Court addresses in depth, § 7(l)(b), initially appears to present a closer question, given its provocative use of the term “human being.” However, upon examination of the disclosures actually required by § 7(l)(b), I would hold that the district court also erred when it enjoined that subsection.
The first issue to be addressed is the proper scope of any preliminary injunction. Next, I proceed to the legal standards for evaluating informed consent provisions in the abortion context and, finally, to an evaluation of each provision of § 7 under those standards.
*730 I. Proper Scope of an Injunction
The first question to be resolved is whether an injunction as to one of the challenged provisions necessitates an injunction as to all of the Act’s provisions, even those that are likely constitutional or were not even challenged by Planned Parenthood. The district court enjoined the entire Act based upon its finding that some provisions were potentially constitutionally infirm, and the Court affirms that approach based on the language of § 10. However, I find that the plain language of § 10 does not support the Court’s reasoning. See Watson v. Ray, 192 F.3d 1153, 1155 (8th Cir.1999) (“When determining the meaning of a statute, our starting point must be the plain language of the statute.”).
The Act contains the following provisions regarding court action (emphases added):
Section 10. If any court of law enjoins, suspends, or delays the implementation of the provisions of section 7 of this Act, the provisions of [the previous version of the statute] are effective during such injunction, suspension, or delayed implementation.
Section 11. If any court of law finds any provisions of section 7 of this Act to be unconstitutional, the other provisions of section 7 are severable. If any court of law finds the provisions of section 7 of this Act to be entirely or substantially unconstitutional, the provisions of [the previous version of the statute] are immediately reeffective.
Although I agree with the Court that § 11 does not apply at this stage of the proceedings, I note that its structure demonstrates a marked contrast with § 10. Section 11 considers two potential actions: a court finding that “any provisions” of § 7 are unconstitutional, in which case the remaining provisions are preserved, and a court finding that “the provisions” of § 7 are entirely unconstitutional, in which case the former version of the statute is reinstated. On the other hand, § 10 considers only one potential action: a court finding that enjoins “the provisions” of § 7, in which case the former version of the statute is reinstated.
Despite the legislature’s use in § 10 of only the plural with a definite article (“the provisions”), the Court reads § 10 as though it says “any provision” and therefore concludes that “[t]he present situation actually fits squarely under § 10 of the Act.” Ante at 729. In my view, because § 10 contains only the all-inclusive phrase “the provisions” instead of addressing “any provision,” the Court’s reading is incorrect. Courts have recognized that the use of the plural is an integral part of a statute’s construction. Thus, for example, we have previously concluded that the phrase “civil rights” inherently refers to “a cluster of rights” rather than a single right. United States v. Keeney, 241 F.3d 1040, 1044 (8th Cir.2001). We are not alone in our approach to this canon of statutory construction. See, e.g., Metro. Stevedore Co. v. Rambo, 515 U.S. 291, 296, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995) (“The use of ‘conditions,’ a word in the plural, suggests that Congress did not intend to limit the bases for modifying awards to a single condition ....”) (quoting 2A, Norman J. Singer, Sutherland on Statutory Construction § 47.34 (5th ed. 1992) (“Ordinarily the legislature by use of a plural term intends to reference more than one matter or thing... ,”)).[5]
*731 Because § 10 does not expressly address the steps to be taken if a court enjoins fewer than all “the provisions” of § 10, I believe the Court makes a mistake in reasoning that “it was not for the district court to imply [a severability provision] by picking and choosing which provisions of the Act should be allowed to go into effect prior to a final judgment.” Ante at 729. The Supreme Court recently held the opposite in Ayotte v. Planned Parenthood of N. New England, — U.S. —, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). In Ayotte, the Supreme Court reviewed a district court’s decision (affirmed by the First Circuit) to permanently enjoin an entire parental consent law because the law lacked an exception that would allow a minor to receive an abortion without consent in the case of a medical emergency. Id. at 965. Although the district court and First Circuit enjoined the entire law, the Supreme Court vacated the judgment, holding “that invalidating the statute entirely is not always necessary or justified, for lower courts may be able to render narrower declaratory and injunctive relief.” Id. at 964.
The Supreme Court reasoned that “when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.” Id. at 967 (internal citations omitted). The legislature’s intent is at the crux of the test to be applied. “After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?” Id. at 968. The Supreme Court resolved the issue presented in Ayotte by remanding for a determination of whether the New Hampshire legislature would have preferred that only the unconstitutional provisions be enjoined. The Supreme Court clearly thought that such a remedy was possible, as “[o]nly a few applications of New Hampshire’s parental notification statute would present a constitutional problem.” Id. at 969.
As in Ayotte,[6] there is no reason in the instant case for the district court to adopt “the most blunt remedy” where the parties ask for “relief more finely drawn.” Id. “Severability is of course a matter of state law.” Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 *732 (1996) (per curiam). Under South Dakota law, constitutional portions of a statute are severable at the preliminary injunction stage if (1) they can stand by themselves after the unconstitutional clauses are struck, and (2) it appears the state legislature would have intended the constitutional portions to take effect without the invalidated clauses. Roberts v. Barnett, 582 N.W.2d 386, 394 (S.D.1998). The party arguing against severability has the burden of showing that the legislature would not have enacted the statute without the severed portion. Id. In the instant case, if less than all of the provisions of § 7 are found to necessitate an injunction, the record is clear that the South Dakota legislature would prefer that only the unconstitutional provisions of § 7 be enjoined. Section 11, which establishes the sever-ability of provisions not held to be unconstitutional on the final merits, shows the legislature’s clear intent to preserve the constitutional provisions of § 7 wherever possible.
The very nature of the Act reinforces this conclusion. The legislature clearly believed that a patient’s decision to consent was not fully informed unless all the information outlined in § 7 was provided to the patient. See § 7 (“A consent to an abortion is not voluntary and informed, unless ... the physician provides that pregnant woman with the following information .... ”). Thus, to conclude now that the State would prefer each and every provision to be enjoined should any of them be enjoined, one would have to find that the State preferred that none of the new information it considers indispensable, even information for which the court has found no likely constitutional infirmity, be given to the patient unless it all can be given. Nothing indicates to me that this was the case. Therefore, the entire Act should not have been enjoined based upon the Court’s conclusion that one provision was properly enjoined. Ayotte, 126 S.Ct. at 968.[7]
Having determined that only those individual provisions of the Act that merit a preliminary injunction, if any, should be enjoined, I now proceed to examine each disclosure provision of the Act.
II. Applicable Law for Evaluating the Likelihood of Success on the Merits
This appeal presents two distinct constitutional issues: (i) whether the Act’s in *733 formed consent provisions constitute an undue burden upon the patients’ substantive due process rights to obtain an abortion; and (ii) whether requiring physicians to obtain their patients’ informed consent in the manner legislated by the Act violates the physicians’ First Amendment right not to speak. Much of the law relevant to physicians’ First Amendment rights in the context of informed consent to abortions is embedded within explanations of the undue burden standard in Casey. I begin by extracting the governing law, relying for the most part on Casey, and then proceed to apply that law to each provision of § 7.
A. The Undue Burden Standard
The well-known undue burden standard was enunciated by a three-justice joint opinion of the Supreme Court in Casey.[8] A statute or regulation is an undue burden if it “has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.” Casey, 505 U.S. at 877, 112 S.Ct. 2791. Under this standard, not every burden upon a woman’s exercise of her right to an abortion is an undue one. “The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.” Id. at 874, 112 S.Ct. 2791. Stated another way, “not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right.” Id. at 873, 112 S.Ct. 2791. Instead, laws imposing undue burdens are those that in some “real sense deprived women of the ultimate decision.” Id. at 875, 112 S.Ct. 2791. And “under the undue burden standard a State is permitted to enact persuasive measures which favor childbirth over abortion, even if those measures do not further a health interest.” Id. at 886, 112 S.Ct. 2791. In the context of informed consent, “[i]f the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.” Id. at 882, 112 S.Ct. 2791.
Several cases illustrate the boundaries of the undue burden standard. In Stenberg, 530 U.S. at 930, 120 S.Ct. 2597, the Supreme Court held unconstitutional a statute banning partial-birth abortions. First, the Court held that the statute was unconstitutional because of the absence of an exception for the preservation of the health of the mother, a requirement independent from the undue burden standard. Id. In addition, the Court held that the statute’s broad language criminalized “the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The result is an undue burden upon a woman’s right to make an abortion decision.” Id. at 945-46, 120 S.Ct. 2597. In Casey itself, a 24-hour waiting period was held not to be an undue burden, even though “the waiting period has the effect of increasing the cost and risk of delay of abortions.” 505 U.S. at 886, 112 S.Ct. 2791 (internal quotation omitted). However, a spousal notification provision created an undue burden because it was “likely to prevent a significant number of women [who fear for their safety and the safety of their children] from *734 obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle.” Id. at 893-94, 112 S.Ct. 2791. In Miller, we found a parental-notification provision without an adequate bypass procedure created an undue burden because it would operate to prevent abortions even for mature minors or for minors who could demonstrate that an abortion was in their best interests, 63 F.3d at 1458, and even for some abused minors, id. at 1463.
From cases such as these, it is clear that a statute does not constitute an undue burden unless it in a “real sense deprive[s] women of the ultimate decision.” Casey, 505 U.S. at 875, 112 S.Ct. 2791. Planned Parenthood has cited no case where a provision merely requiring the disclosure of information prior to the procedure has been invalidated as an undue burden.
B. Free Speech Rights of Physicians
The law governing compelled speech by physicians is relatively undeveloped. Nevertheless, four relevant principles can be derived from the ease law, especially from Casey in the context of informed consent to abortion, and those principles should guide our analysis of the Act. First, as the Court noted, citizens have a right not to be compelled to speak under many circumstances. Ante at 721-22 (citing Wooley, 430 U.S. at 714, 97 S.Ct. 1428).
Second, physicians enjoy a diminished right not to be compelled to speak in the context of practicing medicine, as that practice is subject to state licensing and regulation.
Thus, a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure.
All that is left of petitioners’ argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician’s First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.
Casey, 505 U.S. at 884, 112 S.Ct. 2791 (internal citations omitted) (emphasis added). Thus, the State may require the physician to provide information the State deems necessary for informed consent to a medical procedure. The outer bounds of this relationship are not expressly defined. At a maximum, it may be that the State can direct the physician to provide any disclosure that is otherwise permissible under the undue burden standard. At a minimum, the State can, at the least, direct physicians to provide the type of information contained in the informed consent statute deemed acceptable in Casey.
Third, the State is permitted to voice its preference for childbirth, even before the fetus is independently viable. Casey, 505 U.S. at 846, 112 S.Ct. 2791 (noting that one of Roe’s “essential holding[s]” was that “the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child”); see also id. at 869, 112 S.Ct. 2791 (“The woman’s liberty is not so unlimited ... that from the outset the State cannot show its concern for the life of the unborn, and at a later point in fetal development the State’s interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.”); id. at 870, 112 S.Ct. 2791 (“the State has a legitimate *735 interest in promoting the life or potential life of the unborn”).
This substantial state interest allows the state to inform its citizens about the “philosophic and social arguments” against abortion. As Casey held in the course of addressing Pennsylvania’s informed consent law:
Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. The Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.
505 U.S. at 872, 112 S.Ct. 2791 (internal quotation omitted) (emphases added).
Not only did Casey emphasize in broad terms the State’s right to voice its views, it also noted limitations on the patient’s right not to listen. Thus, “[w]hat [was] at stake [in Casey was] the woman’s right to make the ultimate decision, not a right to be insulated from all others in doing so.” Id. at 877, 112 S.Ct. 2791. As such, “[r]egula-tions which do no more than create a structural mechanism by which the State ... may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman’s exercise of the right to choose.” Id. Ultimately, “a state measure designed to persuade her to choose childbirth over abortion will be upheld if reasonably related to that goal.” Id. at 878, 112 S.Ct. 2791.
Fourth, in furtherance of its interest in childbirth, the State can require the physician to provide even non-medical information as part of obtaining a patient’s informed consent. In Casey, the Court approved a statute whereby the State required the physician to inform the patient that the father of her child would be liable for child support and that other agencies and organizations would help the patient should she want an alternative to abortion. 505 U.S. at 881, 902-03, 112 S.Ct. 2791. “In short, requiring that the woman be informed of ... the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion.” Id. at 883, 112 S.Ct. 2791.
III. Application of Casey’s Principles to the Disclosure Provisions of the Act
I begin by applying the principles set forth above to the provisions of the Act that were enjoined without extensive analysis by the district court. These include § 7(l)(e) (the “medical advice provisions”) and § 7(l)(c), (d) (the “legal advice provisions”). I then review § 7(l)(b), which was the primary focus of both the district court’s order and the Court’s opinion today.
A. The Medical Advice Provisions
Among the subsections enjoined by the district court are several provisions requiring the physician to provide certain medical advice. The information that must be provided includes a “description of all known medical risks of the procedure and *736 statistically significant risk factors to which the pregnant woman would be subjected.”
§ 7(l)(e). Among the risks delineated by the state legislature, the physician must provide the patient with information concerning “[depression and related psychological distress,” “[ijncreased risk of suicide ideation and suicide,” “an accurate rate of deaths due to abortions, including all deaths in which the abortion procedure was a substantial contributing factor,” and “[a]ll other known medical risks to the physical health of the woman, including the risk of infection, hemorrhage, danger to subsequent pregnancies, and infertility.” § 7(1) (e) (i)-(iv). The physician must also disclose the “probable gestational age of the unborn child at the time the abortion is to be performed, and a scientifically accurate statement describing the development of the unborn child at that age; and ... [t]he statistically significant medical risks associated with carrying her child to term compared to undergoing an induced abortion.” § 7(l)(f), (g).[9]
A state’s right to require a physician to deliver the type of medical information outlined above is clearly established. See, e.g., Casey, 505 U.S. at 881-82, 112 S.Ct. 2791. Casey expressly found that the mental health effects of abortion are a substantial and valid consideration in the context of abortion. Id. at 882, 112 S.Ct. 2791 (“It cannot be questioned that psychological well-being is a facet of health.”). There is no reason why informing a woman of the potential mental side-effects of abortion is not the proper subject for an informed consent dialogue. The same is true of the risk of death, infection, hemorrhage and subsequent infertility. And Casey itself approved the requirement that the gestational age be given to the patient. Id. at 881, 112 S.Ct. 2791. I would conclude, therefore, that the medical advice provisions are permissible as a matter of law under well-established precedent and should not be enjoined.
B. The Legal Advice Provisions
The Act requires a physician to inform his or her patient that there are legal protections associated with her relationship with her unborn child and that terminating the pregnancy will terminate those protections. See ante at 719-20 (reproducing § 7(l)(c), (d)). As outlined above, the State is empowered to require the provision of legal information, as well as medical information, that might be relevant to a woman’s decision concerning whether or not to deliver her child. There is no doubt that the relationship between a mother and her unborn child is a legally protected one. “Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.” Casey, 505 U.S. at 851, 112 S.Ct. 2791 (citing Carey v. Population Servs. Int’l, 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)). The right to carry a child to term under most circumstances is undisputed. See Casey, 505 U.S. at 859, 112 S.Ct. 2791 (noting that Roe equally stands for the proposition that a State cannot “readily restrict a woman’s right to choose to carry a pregnancy to term as to terminate it, to further asserted state interests in population control, or eugenics, for example”).
The Act’s requirement that the physician tell the patient in general terms about the existence of legal protections associated with the relationship she enjoys with her unborn child is no less relevant to informed consent than the requirement, *737 upheld in Casey, that a physician inform his patient that she could obtain financial assistance from the child’s father. Id. at 881,112 S.Ct. 2791. Information about the right to financial support from the father would mean little without knowledge of the right to carry the child to term, perhaps in the face of a father who is pressuring the patient to have the abortion. As such, I would conclude that the legal advice provisions are permissible under Casey and should not be enjoined.
C. Section 7(l)(b)
Section 7(l)(b) requires a disclosure “[t]hat the abortion will terminate the life of a whole, separate, unique, living human being.” In turn, § 8(4) of the Act defines “human being” as “an individual living member of the species Homo sapiens, including the unborn human being.... ” The district court found § 7(l)(b) violated physicians’ First Amendment rights because it “requires abortion doctors to enunciate the State’s viewpoint on an unsettled medical, philosophical, theological, and scientific issue, that is, whether a fetus is a human being.” Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 375 F.Supp.2d 881, 887 (D.S.D.2005).
The Court essentially agrees with the district court’s analysis. Even though the Act defines “human being” as a “member of the species Homo sapiens,” including at the fetal or embryonic stage, the Court finds this statutory definition irrelevant because most patients, upon encountering the phrase “human being,’’are likely to construe it in the broad, general sense of “person.” Ante at 723. Having determined that the legislated definition is irrelevant, the Court then upholds the district court’s preliminary determination that the statement required by § 7(l)(b) is ideological in nature, rather than objectively medical or scientific. Ante at 723-24. The Court supports this conclusion by reference to the legislative fact, established in Roe and approved in later cases, that a fetus is not a “person” and that there is no medical, scientific or moral consensus as to when life begins. Ante at 724. Finally, the Court reasons that, because the required disclosure is ideological, it violates the physicians’ right not to speak, regardless of the physicians’ right to disassociate from the message delivered. Ante at 725.
In my view, the Court perpetuates an error in the district court’s essential premise. The Court’s reasoning turns upon the premise that the language of § 7 of the Act establishes a script for the required disclosure that includes the term “human being,” unaccompanied by the limiting definition in § 8. Based upon this premise, the Court concludes that the disclosure will be interpreted to state that the abortion will terminate the life of a “person.” Ante at 723. In other words, although the provision is not inherently ideological if the statutory definition of “human being” is substituted, the Court finds that it is likely to be interpreted as ideological in practice. Ante at 723. However, the Act contains no indication that a physician must provide a written script of the exact words of § 7 to the patient. Section 7 bears no quotation marks to identify mandatory language. Rather than providing a scripted disclosure statement, § 7 merely directs the physician to categories of information that must be conveyed. Thus, the physician must give, inter aha, his or her name in writing, § 7(l)(a), a statement that the woman enjoys a legally protected relationship that will be terminated if she receives an abortion, § 7(l)(c), (d), and a “description of all known medical risks of the procedure,” “including” certain subcategories, § 7(l)(e). This last provision illustrates well that § 7 is not meant to establish a script, as the provision itself does *738 not purport to contain an exhaustive list of the risks to be described to the patient.
If the language in § 7(l)(b) is not a script, which it surely is not, then there is no justification for ignoring the legislature’s definitions for the terms used in the Act. See, e.g., S.D. Warren Co. v. Maine Bd. of Envtl. Prot., — U.S. —, 126 S.Ct. 1843, 1847, 164 L.Ed.2d 625 (2006) (resorting to a term’s “ordinary or natural meaning” because “it is neither defined in the statute nor a term of art”); FDIC v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (“In the absence of such a [statutory] definition, we construe a statutory term in accordance with its ordinary or natural meaning.”) (emphasis added). While it is true that the Act requires the physician to tell the patient that she will be terminating the life of a “human being,” the definition makes clear that this means only that the physician must inform the patient that she is terminating a “living member of the species of Homo sa-piens” in the embryonic or fetal stage. § 8(4). Precisely the same disclosure would be required if, instead of “human being,” § 7(l)(b) required the physician to tell the patient that she would be terminating a “member of the class defined in § 8(4).” Just as there would be no need to resort to the dictionary definition of the word “member” to interpret the disclosure required in that case, there is no need to resort to the dictionary definition of “human being” to interpret the Act as written.[10]
There is no doubt that certain terms take on freighted meanings in the abortion context, and there is every indication that the South Dakota legislature structured § 7(l)(b) with the term “human being” to broadcast to its constituents its strong preference for childbirth over abortion. However, the decision to embed the narrower, less controversial intended meaning of the term in the “Definitions” section should not cloud our analysis of the disclosures actually required for compliance with the Act. In the most practical terms, having reviewed the Act, I find no legitimate reading of it that would allow the State to prosecute a physician who failed to use the term “human being” in the required disclosures, or who used the term “human being” but told the patient that the term had only the limited meaning of a “living member of the species of Homo sapiens, including [an] unborn human being.”
Accordingly, the proper inquiry for the Court is whether a disclosure that the abortion will terminate the life of a whole, separate, unique, living unborn member of the species of Homo sapiens is truthful, non-misleading and not impermissibly ideological.[11] I find no evidence in the *739 record to suggest otherwise. The declarations from Planned Parenthood’s witnesses, cited by the Court ante at 723, were premised on the broadest general meaning of “human being,” rather than the statutory definition. Likewise, while a recitation conveying the idea that an unborn child is a whole, separate, unique, living “human being” in the general or colloquial sense might conflict with legislative facts originating in Roe regarding legal personhood and the question of when life begins, this concern is not implicated where the terms “whole, separate, unique, living” are used to characterize an unborn member of the species Homo sapiens. Therefore, the Court’s reliance on legislative factfinding to find a likelihood of success on the merits, ante at 723-24, is misplaced.
In essence, the statement that an abortion terminates a whole, separate, unique, living unborn member of the species Homo sapiens is nothing but an unremarkable tautology. It is simply a restatement of the definition of “abortion.” “Abortion” is defined as “the termination of a pregnancy after, accompanied by, resulting in, or closely followed by the death of the embryo or fetus.” Merriam-Webster’s Collegiate Dictionary (11th ed.). No one contends that the embryo or fetus is a member of any species other than Homo sapiens, and it is difficult to imagine the “death” of an entity that was not whole, separate, unique and living in some sense beforehand. Casey itself speaks in terms of “the life or potential life of the unborn.” 505 U.S. at 870, 112 S.Ct. 2791 (emphases added). Consequently, the disclosure required by § 7(l)(b) is truthful, non-misleading and non-ideological on its face and, therefore, does not violate Casey’s standards for compelled speech by a physician in the context of disclosure requirements for informed consent to an abortion.[12]
*740 The Court also holds that the Act constitutes an undue burden upon a patient’s right to obtain an abortion because “[f]orc-ing [the patient] not only to read, but to sign each page of statement containing the state’s moral and philosophical objections to the procedure she has planned and intends to undergo, and forcing her doctor to certify that she ‘understands’ these objections, does little to promote independent decision making and may actually exacerbate any adverse psychological consequences of the procedure.” Ante at 727. However, as discussed above, the disclosures actually required by the Act do not include the State’s “moral and philosophical objections.” In addition, requiring a patient to sign or initial a form stating that she understands the information conveyed is common to most situations in which a patient must give informed consent to medical treatment. See, e.g., S.D.C.L. §§ 27A-8-15 (stating, in the context of admittance for voluntary treatment at a psychiatric health facility, that “[a]n informed consent as defined in § 27A-1-1(8) shall be obtained orally and in writing upon an application form which shall contain in bold print and simple language the substance of [the applicable law].”); 27A-1-1(9) (defining informed consent as “consent voluntarily, knowingly, and competently given ... after conscientious explanation of all information that a reasonable person would consider significant to the decision in a manner reasonably comprehensible to general lay understanding”).[13]
*741 Finally, the Court’s holding that the required disclosure poses an undue burden because it “may actually exacerbate any adverse psychological consequences of the procedure,” ante at 727, creates a catch-22 that would undermine informed consent in general. The very purpose of informed consent is to ensure that a patient understands the long-term consequences of her actions. It often may be true that those disclosures increase anxiety at the same time that they increase the patient’s understanding of the risks and consequences of her actions, but the purpose of informed consent is to ensure that the patient know these things before, not after, she chooses to have a procedure. Thus, in Casey, the Court reasoned that “[m]easures aimed at ensuring that a woman’s choice contemplates the consequences for the fetus do not necessarily interfere with the right recognized in Roe.” 505 U.S. at 873, 112 S.Ct. 2791. Surely, information about “consequences for the fetus” increases the angst felt by a patient who is making a decision to terminate her pregnancy. Yet, under Casey, the State is allowed to present information that does just that, “reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.” Id. at 882, 112 S.Ct. 2791.
In summary, I would find that, on its face, the Act does not create an undue burden or violate physicians’ First Amendment right not to speak. See Thornburgh v. Am. College of Obstetricians & Gynecologists, 476 U.S. 747, 757, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (holding that it is permissible in some instances for appellate courts to rule on the merits of constitutional issues despite the fact that the appeal is from a preliminary injunction), overruled on other grounds by Casey, 505 U.S. at 882, 112 S.Ct. 2791. The Act requires the physician to provide, and to certify to the best of his or her ability that the patient reads and grasps the meaning of, medical and legal information that is for the most part substantially identical to that which has been approved in previous cases. See, e.g., Schafer, 18 F.3d at 531. The novel required disclosures in § 7, a statement that the patient enjoys a relationship with the unborn child that is legally protected and a statement that abortion terminates *742 the life of an unborn member of the species Homo sapiens, are likewise truthful and non-misleading, Casey, 505 U.S. at 882, 112 S.Ct. 2791, and are “reasonable measure[s] to ensure an informed choice ... which might cause the woman to choose childbirth over abortion,” id. at 883, 112 S.Ct. 2791. The physician must provide this information only as “part of the practice of medicine, subject to reasonable licensing and regulation by the State,” id. at 884, 112 S.Ct. 2791, and these requirements do not “plac[e] a substantial obstacle in the path of a woman seeking an abortion,” id. at 877, 112 S.Ct. 2791.
IV. Conclusion
Rather than apply an all-or-nothing approach to enjoining the Act, I would examine each provision to determine whether an injunction is merited on a provision-by-provision basis. Having examined each provision, I would find as a matter of law that the provisions in question do not violate physicians’ First Amendment rights and do not impose an undue burden on patients’ rights to an abortion, without need for further development of the facts. As such, I would hold that the plaintiffs have no chance of prevailing on the merits of these issues, thereby obviating any need to examine the relative harms imposed by any temporary injunctive relief, and I would vacate the district court’s judgment and dissolve the preliminary injunction.

. Nor, in my view, would the former version of the statute be reinstated simply because more than one, but not all, provisions of Section 7 were enjoined. If this were the case, the legislature would have simply said, "If any court of law enjoins, suspends, or delays *731 the implementation of provisions of section 7” or "any provisions of section 7,” rather than "the provisions of section 7” as actually stated.

. Although Ayotte dealt with a permanent injunction, I agree with the Sixth Circuit that Ayotte’s logic is applicable in the context of preliminary injunctions. See Planned Parenthood Cincinnati Region v. Taft, 444 F.3d 502, 516-17 (6th Cir.2006) (relying on Ayotte to vacate in part a preliminary injunction of an entire statute and remanding to the district court to determine whether a narrower injunction would be sufficient). A preliminary injunction in a case such as the instant one may be in place for a period of years, and there is no reason to suppose that we should ignore Ayotte's aversion to the needless thwarting of a legislature's work by an overly broad injunction during that period just because the period has an (as yet unknown) endpoint.
I also note that the case cited by the Court in enjoining the entire statute, Café Erotica, does not stand for the proposition that a court should necessarily enjoin the entirety of a statute on the basis of one suspect provision. The Eleventh Circuit recognized in Café Erotica that "Florida law requires [a court] to sever any provisions of the Ordinance that it finds unconstitutional, while allowing valid portions to stand, but only ¿/"problematic provisions can be distinguished and clearly separated,” and held that severance would not save the statutory scheme it was reviewing. 360 F.3d at 1292 (internal quotation omitted).

. I note that the instant case in particular exemplifies the perverseness of the allor-noth-ing approach to injunctions. Following oral argument in this matter, Planned Parenthood decided to abandon several of their arguments for enjoining certain provisions of the Act. See Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, No. 05-4077, 2006 WL 2092595, at *2 (D.S.D. July 26, 2006). Specifically, Planned Parenthood sought "leave to amend their complaint to abandon two specific causes of action,” including their argument that the provision of the Act requiring the physician to provide a referral to a "pregnancy health center in the reasonable proximity of the abortion facility” was unconstitutionally vague and their argument that the provision requiring physicians to inform their patient of the risks of "depression and related psychological distress” is un-constitulionally false and misleading. Id. at *2-4 ("In short, plaintiffs move to amend their complaint to drop their challenge to the constitutionality of section 7(2)(c);” "Plaintiffs now seek to amend their complaint to withdraw their argument that section 7(l)(e)(i)'s mandatory disclosure of ‘[d]epression and related psychological distress’ as a risk associated with abortion is unconstitutional.”).
In other words, here, Planned Parenthood itself no longer contends that two key provisions of the Act are unconstitutional. Yet, under the Court’s holding today, patients in South Dakota will not receive the information that those provisions required to be disclosed so long as trial of the entire matter is pending before the district court. This approach certainly does not serve the ends of "comity” as they are described by the Court. See ante at 729.

. We have adopted the standards enunciated by the Casey joint opinion as controlling precedent in abortion cases. Miller, 63 F.3d at 1456 n. 7 (recognizing the joint opinion "as the Supreme Court’s definitive statement of the constitutional law on abortion”); see also Stenberg, 530 U.S. at 930, 120 S.Ct. 2597 (2000) (applying, in a majority opinion, the undue burden standard from the Casey joint opinion).

. We have already upheld the constitutionality of some of these provisions in the 1993 version of the statute. See Miller, 63 F.3d at 1467.

. The Court’s interpretation of the Act also creates a constitutional issue where none need be found. Even if the Act could be read to require a recitation of the exact language of § 7(l)(b), including the term "human being" with no limiting definition, the reading presented here is at least equally permissible. Because the reading presented here avoids any constitutional doubts, it is to be preferred. See, e.g., Gomez v. United States, 490 U.S. 858, 864, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.”); see also United States v. X-Citement Video, Inc., 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (the Court presumes "that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions”).

. Regarding the proper test for "impermissible” ideological content, I am not convinced that the State is prohibited from distributing, through the channel of the physician, any ideological view whatsoever. The Court notes that Casey “did not need to confront Justice O’Connor’s concern in City of Akron ... that 'informed consent provisions may ... violate the First Amendment rights of the physician if the State requires him or her to *739 communicate its ideology,' ” ante at 722-23 (quoting City of Akron, 462 U.S. at 472 n. 16, 103 S.Ct. 2481 (O’Connor, J., dissenting)), but the decision of the Casey plurality not to expressly address a single footnote in a previous dissent on the same topic does not convert that dissent into the controlling precedent on "ideology” in the informed consent context. Although the Court distinguishes the Act from the statute at issue in Casey as one that requires physicians "to deliver ideological messages themselves,” ante at 722, the provisions at issue only require physicians to provide a written statement containing information mandated by the State and certify to the best of their ability that the patient understands the State's information. It is important to remember that nothing in the Act requires the physician to represent to the patient, either affirmatively or through silence, that the written statement expresses the physician's personal or professional views.
Casey makes clear that the State may require the physician to serve as a channel for the State’s information to some extent in the informed consent context, even for information that is non-medical. 505 U.S. at 881, 112 S.Ct. 2791. Casey also holds that "the State may enact rules and regulations designed to encourage [the patient seeking an abortion] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term.” 505 U.S. at 872, 112 S.Ct. 2791 (emphasis added). Neither Casey nor any subsequent Supreme Court decision sets an express limit on the State's ability to require physicians to distribute information relevant to informed consent where such permissible "philosophic and social arguments” are included. It is difficult to conceive of any "philosophic and social arguments” the State could make that would not be expressive of the State's ideology. It is not necessary today to resolve what degree of ideology is impermissible, however, because the disclosure required by § 7(l)(b), with the legislated limited definition of "human being” incorporated, is not an ideological statement.

. The Court distinguishes the Act from the statute at issue in Casey on the basis that the Act provides less leeway for a physician to choose not to obtain informed consent for medical reasons. Ante at 13-14. The Court is concerned that the Act requires the physi *740 cian to obtain informed consent unless it is impossible due to a medical emergency. However, the 1993 version of the South Dakota informed consent statute likewise has only a medical emergency exception, rather than a broader exception like the statute at issue in Casey. In Miller, we considered and rejected the argument that the medical emergency-only exception rendered the 1993 version of the statute constitutionally infirm:
The only exception to the mandatory-information provision [S.D.C.L. § 34-23A-10.1 (1993) ] is for a medical emergency.
South Dakota's provision is substantially similar to provisions upheld by the Supreme Court in Casey and by this Court in Fargo Women's Health Organization v. Schafer. The Pennsylvania provision approved of in Casey provided two exceptions not found here: the information on the father's liability for child support could be omitted for rape victims, and other information could be omitted if the physician reasonably believed that providing the information could severely hurt the patient's physical or mental health. Planned Parenthood contends that the lack of such exceptions in the South Dakota law makes it unconstitutional on its face.
We decided this issue in Fargo Women’s Health Organization v. Schafer, where we upheld a North Dakota law similar to the one at issue here. The North Dakota law also lacked the particular exceptions provided by Pennsylvania, but we held that North Dakota’s medical-emergency exception allowed it to pass constitutional muster. Because South Dakota’s mandatory-information provision and medical-emergency exception are virtually identical to those we upheld in Schafer, Planned Parenthood’s argument that they are unconstitutional must fail.
Miller, 63 F.3d at 1467 (citations omitted).

. The district court found that the Act’s requirement that the physician certify, "to the best of his ability,” that the patient "understands” the information provided, § 7(2)(d), could be read to criminalize any attempt by the physician to disassociate from the disclosure required by the State. The district court appeared to interpret the term "understands” as requiring physicians to bring about the patient's agreement with, rather than understanding of, the information required by the State. This definition of "understands” is foreign to the law of informed consent. For example, if this standard applied to informed consent to receive an experimental medicine that might cause an increased risk of bleeding, a physician would need to certify, to the best of his or her ability, that the patient understands what is meant by the phrase "increased risk of bleeding.” The physician would not, on the other hand, need to certify that the patient actually agrees with the stated *741 risk level — something about which patients are entitled to form their own judgments. In short, the goal of the certification appears to be simply to ensure that the patient reads and ”grasp[s] the meaning of” the information provided, rather than to ensure that the patient adopts those views as her own. See Merriam-Webster’s Collegiate Dictionary (11th ed.) (defining "understand").
The district court was also troubled by the absence of an express provision allowing physicians to disassociate themselves from the State’s required disclosures. We have found that express provisions allowing disassociation are relevant to our evaluation of informed-consent provisions. Schafer, 18 F.3d at 534. I note, however, that despite the absence of an express affirmative disassociation provision, nothing in the Act suggests that it is a criminal act for the physician to comment on the State’s information or to provide additional information of his or her own choosing. It is therefore unclear where the Court finds "statutory ambiguity” on this point. See ante at 725. To read a criminal statute to criminalize an action because that action is not expressly stated to be legal would be to turn criminal law on its head. Any particular act — such as disassociating oneself from a written statement one is required by the State to provide — is innocent conduct unless it is expressly criminalized by an applicable statute. For example, the Act also fails to expressly allow the physician to talk about the gender of the fetus. Is it therefore ambiguous whether the Act criminalizes that speech? I think not. In short, I suspect that if the Act dealt with informed consent for any other medical procedure, any claim that the Act’s failure to mention disassociation rendered it "ambiguous” on the subject would be deemed frivolous.